FILED
2005 Aug-15  AM 11:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | **CR 05-B-0092-W** |
| | ) | |
| **JOSEPH WILLIAM KILGORE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently before the court on defendant's Motion to Suppress Evidence and Statements. (Doc. 9.) Defendant asks the court to suppress "any of his statements or writings including, but not limited to: (1) any conversations overheard by government agents, (2) interviews with law enforcement agents (city, state or federal), and (3) any physical evidence seized from defendant's person or possession." (*Id.* at 1.) An evidentiary hearing was held on May 31, 2005.

Based on the evidence presented, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion to Suppress Evidence and Statements is due to be denied.

## I. FINDINGS OF FACT

On June 3, 2004, Officer Jason Beams was dispatched to the residence at 75 West Way, Woodstock, Alabama to investigate a "911 hang up." (Hearing Transcript at 4.) Officer Beams testified that he went to the residence shortly after 4:00 p.m., and, after knocking numerous times on the door, the defendant, Joseph William Kilgore, came to the

door.  (*Id.* at 24-25, 28.)  Officer Beams explained that he was at the residence to investigate a 911 hang-up call.  (*Id.* at 28.)  He testified he told  Kilgore "about [his] procedure going to 911 calls . . . that something could be wrong inside the house, that [he] needed to check out everything before [he] left."  (*Id.* at 5.)  Beams testified that, at the police academy, he had been taught "when I get a 911 hang up call, I need to investigate inside the house because there could be a subject in there that called 911 that was not on the outside of the house, some foul play, if somebody was hurt or whatever.  That's why I told him I needed to go in the house."  (*Id.* at 8.)

Kilgore refused Officer Beams permission to enter his house.  (*Id.* at 7.)  Beams testified that Kilgore was "fidgety" and "real nervous."  (*Id.* at 8.)  Beams told Kilgore he was going to call for back-up and told Kilgore to stay on the front porch.  (*Id.* at 6-7, 62.) Beams went to his car to call the county sheriff's department and ask for back-up.  (*Id.* at 7, 63.)  Kilgore testified he "waited for a little while," and then he walked over to Beams as he sat in his car and "told him to come on in."  (*Id.* at 63; *see also id*. at 7-8.)  He testified that he told Beams, "[Y]ou can take a quick walk through the house because there's no one here, no one here to be hurt and there's no one here who made a call."  (*Id.* at 63.)  Kilgore testified that he thought "if I did not let [Beams] come in, that the county would come and come on in anyway, . . . I was thinking they would probably get a search warrant or something."  (*Id.*)  Beams testified that, if Kilgore had not given him consent to check out

the house after the 911 hang-up call, he "would have had to go a roundabout way to get in the house  . . . like maybe talk to a judge."  (*Id.* at 8.)

Kilgore and Beams entered the house. (*Id.* at 64.)  The first room they entered was the living room.  (*Id.* at 30.)  As soon as he walked into the living room, Beams smelled marijuana.  (*Id.* at 31.)  He testified that he smelled marijuana throughout the house.  (*Id.*)  After the living room, Beams and Kilgore walked down a long hallway with bedrooms on either side.  (*Id.* at 30.)  Beams "peeped" through the bedroom doors, but he did not "search through any part of the room, . . . lift or uncover anything or look inside closets."  (*Id.*)  After looking in the bedrooms Beams and Kilgore walked back toward the living room, Beams noticed a roach clip that held a roach, the remains of a marijuana cigarette, in an ashtray on an end table next to the couch.  (*Id.* at 34.)

Kilgore testified that Beams pushed around some tobacco cigarette butts to find that marijuana; Beams denies that he moved anything.  (*Id.* at 9, 65.)  In the photographs of the scene, the court notes that the roach clip is clearly visible.  (Govt. Ex. 3, picture 5.)  The court finds, as a matter of fact, that Beams did not disturb the cigarette butt in the ashtray, looking for marijuana.

After seeing the roach clip and the remains of a marijuana cigarette, Beams  asked Kilgore if he smoked smoked marijuana and Kilgore told him that he did.  (Hearing Transcript at 34.)  At this point Beams placed Kilgore in handcuffs, told him he was not under arrest, and sat him on the couch.  (*Id.*)  Next to where Kilgore sat on the couch, Beams

saw a plastic container of marijuana, which included buds of marijuana.   (*Id.* at 11, 34, 82.)

Kilgore testified that he had placed magazines on top of the container, which Beams had

moved to find the marijuana.  (*Id.* at 65-66.)  Beams denied that he moved anything.  (*Id.* at

11, 78.)  The court finds that Kilgore's testimony is not credible; the court credits Beams

version of the events, including the fact that the marijuana was found in plain view.

Deputy James J. Cromer, Jr. and other officers of the Bibb County Sheriff's

Department arrived on the scene at approximately 4:30 p.m.  (*Id.* at 49.)  At this time Beams

told Kilgore he was under arrest, read him his *Miranda* rights, and placed him in a patrol car.

(*Id.* at 10.)  Beams testified that he explained to Kilgore "what [he] was going to do."  (*Id.*

at 38.)  He testified:

> I explained to [Kilgore] due to the large amount of marijuana we found
> inside the living room right there, that I had probable cause to get a search
> warrant for the house.  And I explained to him what a search warrant was, you
> get one from . . . the judge.  And then I explained to him that we had a consent
> to search form, and I showed him the consent to search form and [Kilgore]
> asked me, . . . how long it would take, which is the quickest way to do it.  And
> I advised him that of what I had to go through to get a search warrant.
>
> . . .
>
> Which was going to Bibb County and meeting with the DA and then
> getting permission for the search warrant and talking to the judge and him sign
> it and me coming back up there.

(*Id.*)  Beams testified that Kilgore signed the consent to search form because "he just wanted

to do it the quickest way because he didn't want to be outside his house, all the cars and

stuff."  (*Id.* at 39; *see also id.* at 14-15.)

Kilgore's testimony regarding the events varies from that of Beams. He testified that Bibb County Deputies and Woodstock Policemen were in his house before he signed the consent form. (*Id.* at 67.) He said one of the deputies told him that if he did not sign the consent form, he would call the drug-sniffing dog. (*Id.* at 67-68.) He testified:

> And during our conversation that they had with me initially telling them no, they cannot search my house, they said, well, we'll have to bring in the dog, we know we've got some here because you don't buy that kind of marijuana on the street, and our dog doesn't like cats. We see you've got these cats. Our dog doesn't like these cats. So I was – I definitely did not want anything to happen to my cats and I didn't want my house torn up either.

(*Id.* at 67.) Despite his testimony that "they" – referring to the Bibb County Deputies and Woodstock Police Officers – made these statements, when asked which officer made the statement about the dog, Kilgore stated, "I'm not exactly certain, but it was ***one*** of the deputies. I don't know exactly which deputy it was. (*Id.* at 67-68 (emphasis added).) Kilgore also testified that he was actually "transported to Bibb County jail in the canine unit with the canine in there." (*Id.* at 68.) The court finds this testimony not to be credible.

Officer Beams and Deputy Cromer testified that they did not call for the canine unit, did not remember a dog on the scene, and did not threaten to call for the canine unit. (*Id.* at 39, 46, 52-53, 58, 60.) Cromer testified that there was no need for a drug-sniffing dog. (*Id.* at 58.) Also, Cromer testified that he walked to the door of the house while Kilgore was seated on the couch, but he did not enter the house before Kilgore signed the consent. (*Id.* at 59.) Moreover, from the testimony, the court finds that Beams would have been aware of any threat to Kilgore's cats if such a threat was made before he signed the consent form.

Based on his testimony, he did not leave Kilgore unattended in the presence of other law enforcement officers prior to the time Kilgore signed the consent form. (*See id*. at 9-10, 34, 36-40.)  Therefore, the court finds that Kilgore's cats were not threatened.  Also the court finds that Beams and Cromer would have been aware of the presence of a dog at the scene if it had been there.  Because neither witness remembers the dog, and the court finds Beams and Cromer are credible witnesses, the court finds there was no drug-sniffing dog at the scene.  Kilgore's testimony to the contrary is deemed not credible.

The consent-to-search form, signed by Kilgore, stated that it authorized the officers to search the Woodstock residence and Kilgore's vehicle.  (*Id.* at 41.)  It also authorized the officers to remove "whatever document or items of property whatsoever which they deem pertinent to their investigation."  (*Id.*)  Further the form stated that "written permission" was given "freely and voluntarily without any threats or promises having been made," and that Kilgore had been told that he had the right to refuse the search and seizure.  (*Id.*)

After Kilgore signed the consent-to-search form, Beams, Cromer, and other officers searched his home.  (*Id.* at 42, 53.)  Beams and Cromer testified that they were looking for documents as well as drugs because of the marijuana buds found in the living room.  (*Id.* at 42-43, 54.)   According to Beams and Cromer, "it's not normal to see people buying marijuana buds;" therefore, they suspected Kilgore was involved in growing and distributing marijuana.  (*Id.* at 42-43, 54.)

As part of the search for documents related to the suspected growth and distribution of marijuana, the officers collected Kilgore's computer and compact discs and floppy discs. (*Id.* at 55.)  The computer and discs were turned over to the FBI.  (*Id.*)  Also, Cromer searched Kilgore's bedroom for documents.  (*Id.* at 56.)  In a drawer in a chest of drawers in defendant's bedroom, Cromer found a folder containing what appeared to be child pornography.  (*Id.* at 58.)

During the search Beams looked around the outside of the house for marijuana plants. (*Id.* at 20, 44.)  He saw a padlocked door to the basement.  (*Id.* at 44.)  He asked Kilgore for the key, and Kilgore gave Beams the key from his pocket.  (*Id.*)  Upon entering the basement, Beams found "an awful lot of [marijuana] plants down there."  (*Id.*)

Kilgore was indicted in this court on one count of possession of child pornography and five counts of receiving child pornography.  (Doc. 1.)

## II. <u>DISCUSSION</u>

In his Motion to Suppress, defendant argues:

2.  Any physical evidence seized from defendant's person or possession was seized as a result of searches and other illegal intrusions into defendant's person or property or by illegal intrusions into the person and property of another without their consent.  Denfendant denies that he gave permission for law enforcement to enter the residence and search his computer.

3.  Any search or seizure was done without probable cause or upon exigent circumstances and done without a search warrant.

4.  That the initial entry into Defendant's home was obtained by threats or coercion and without probable cause based on what police asserted was a hang-up call to 911.  Defendant denies that any such call occurred.

     5.  Law enforcement conducted a search pursuant to what they contend was a consensual search for drugs and then conducted a search of the Defendant's computer without probable cause.  Furthermore, assuming that law enforcement had consent to search for drugs, their search of Defendant's computer and the material contained on it along with the manner in which it occurred unconstitutionally exceed the scope of any consent given by the Defendant.

(Doc. 9 ¶¶ 2-5.)  He asks the court to suppress all items seized from his home and any

statements made following the seizure.  (Hearing Transcript at 2.)

    The Supreme Court has held:

    The touchstone of the Fourth Amendment is reasonableness.  The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.  Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.  The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?

*Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991).

    "The Fourth Amendment test for a valid consent to search is that the consent be

voluntary, and '[v]oluntariness is a question of fact to be determined from all the

circumstances.'"  *Ohio v. Robinette*, 519 U.S. 33, 40 (1996)(quoting *Schneckloth v.

Bustamonte*, 412 U.S. 218, 248-49 (1973)).  "[T]he government bears the burden of proving

that the consent was not a function of acquiescence to a claim of lawful authority but rather

was given freely and voluntarily."  *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir.

1996)(internal citations and quotations omitted).  "Factors relevant to this determination

include the circumstances under which the defendant came into custody, the defendant's

awareness of the right to withhold consent, the defendant's performance of cooperative acts, the defendant's age, intelligence, and education, and the nature of the police behavior." Elizabeth Jordan Gianturco and Rudolph Andrew Muller. *Warrantless Searches and Seizures*, 73 GEO. L.J. 298, 323 -324 (Dec. 1984)(footnotes omitted).

## A.  INITIAL ENTRY

The court finds that Beams initial entry into Kilgore's residence was consensual.

Kilgore testified that Beams asked to come into the house to check out the 911 hang-up call; Kilgore initially refused.[1]  Beams told Kilgore to stay on the porch while he called

---

[1]The court notes that the Supreme Court of New Jersey has held that an officer dispatched to investigate a 911 hang up call may be justified in entering the residence from which the call was made under the emergency aid doctrine. *State v. Frankel*, 847 A.2d 561, 576 (N.J. 2004).  The court held:

New Jersey has a detailed statutory and regulatory scheme for the implementation of the 9-1-1 system throughout the State.  Telephone companies are required to forward the telephone number and street address of any telephone used to place a 9-1-1 call to 9-1-1 dispatchers for the purpose of responding to emergency calls. . . .  The police maintain records of 9-1- 1 calls not only for the purpose of responding to emergency situations but to investigate false or intentionally misleading reports.  Moreover, the use of 9-1-1 to falsely report an emergency is a crime.  A 9-1-1 call carries a fair degree of reliability, because it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making such a call, unless there was a true emergency.

More than ninety-five percent of all 9-1-1 calls received by police departments are a result of a person dialing that number.  That only two to five percent of such calls are generated accidentally by non-human means in no way diminishes the probability that a 9-1-1 call is the signal of an emergency.  An open line 9-1-1 call, by its very nature, may fairly be considered an SOS call, a presumptive emergency, requiring an immediate response.  That

presumption must apply because the dispatcher does not know whether the caller is a stroke or heart attack victim, a child in need of assistance, a person overcome by smoke or, more generally, a person whose life is endangered but unable to speak.  That presumption is rebuttable and may be dispelled by any number of simple explanations given by the homeowner to the responding police officer.  A mother may explain that her child, who appears at the door with her, impishly dialed the number.  A resident, who otherwise raises no suspicions, may state that he intended to call 4-1-1 but pushed the wrong digit and due to distraction inadvertently left the telephone off the hook.  Those circumstances when viewed in their totality would likely persuade a reasonable police officer that there is no need for further investigation.  Conversely, the circumstances confronting the public safety official may corroborate the existence of an emergency.  For example, smoke escaping from under a door might be a clear sign of a fire.

  . . .

  It does not require a flight of imagination to picture circumstances in which a person who suddenly takes ill dials 9-1-1 and is incapacitated and unable to speak.  The police officer at the door, of course, cannot know what type of emergency, if any, lies inside – all he knows is that the caller has dialed an emergency response number.  In light of the presumptive emergency, we cannot conclude that the officer is bound to ignore the warning and walk away.  Each case must be decided on the totality of the circumstances confronted by the public safety official, who must weigh the competing values at stake, the privacy interests of the home versus the interest in acting promptly to render potentially life-saving assistance to a person who may be incapacitated.  There is no bright line or magic formula to be applied across the board.  A fact-sensitive analysis must be applied to each case.

  . . .

  . . . A 9-1-1 call is tantamount to a distress call even when there is no verbal communication over the telephone to describe the nature of the emergency.  The responding police officer is not required to accept blindly the explanation for the 9-1-1 call offered by the resident answering the door, but must base his decision on the totality of the circumstances.  Courts are loath to second-guess decisions made in good faith with the intent of protecting life

for back-up.  Beams returned to his car, and, after he called for back-up, Kilgore approached

his car.  Kilgore admitted during the hearing that he told Beams "to come on in," and that he

told Beams he could "take a quick walk through the house."  The court finds that Kilgore

---

when the circumstances clearly reveal a legitimate emergency that will not
abide delay.

. . .

That there are a small percentage of non-human generated 9-1-1 calls
and 9-1-1 calls that are made inadvertently does not place in doubt the overall
reliability of the 9-1-1 emergency response system or lessen the significance
of any one open line call.  Public safety officials must respond to every open
line 9-1-1 call as though a true emergency is unfolding.  We must decide
whether Officer Gelber was able to point to specific and articulable facts
which, taken together with rational inferences from those facts, reasonably
warranted his entry into defendant's home under the emergency aid doctrine.
. . . Officer Gelber was entitled to conclude that the person who attempted to
make the 9-1-1 call may have been prevented from completing the call and
was in need of emergency assistance.  We find that Officer Gelber had an
objectively reasonable and good-faith basis to believe that an emergency was
at hand that could not brook delay.  Moreover, we find that the officer's
motivation for entering the home was transparent – to ensure that a victim was
not lying somewhere within the house.  There was no credible evidence that
the officer harbored the ulterior motive of hunting for evidence of a crime to
pin against defendant.  The scope of Officer Gelber's search was limited to the
emergent mission – looking into areas where a person or body could be
located.  The officer could not ignore the evidence of drug activity that he
observed in plain view.

Id. at 571-72, 574-575 (footnotes, internal citations and quotations omitted).  Because the
court finds that Beams entered Kilgore's house with his consent, this court need not decide
whether Beams could have been entered the house based on the emergency aid doctrine,
based on the 911 hang-up call and Kilgore's behavior at the scene.

11

voluntarily and freely consented to Beams entering and walking through his house, and there is no evidence to the contrary.

## B.  PLAIN VIEW

The court finds that evidence of marijuana use and the container of marijuana buds were in plain view and were observed by Beams while he was in defendant's residence with defendant's consent.  As such this evidence was legally seized.  *See United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)("The seizure of an item that falls outside the scope of a consent search is within the plain view exception if:  (1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'")(citing *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003)).  Therefore, defendant's Motion to Suppress this evidence is due to be denied.

## C.  CONSENT-TO-SEARCH FORM

The court finds that Beams had probable cause to arrest Kilgore based on the evidence found in plain view.  After arresting Kilgore, Beams read him his *Miranda* rights, told him that he was going to get a search warrant based on the amount and type of marijuana found, and explained the consent-to-search form.  According to Beams, Kilgore asked him how long it would take and what was the quickest way to do it.  When Beams told him the consent form would be quicker, Kilgore agreed to sign the form.  The consent form clearly states that Kilgore had the right to refuse to give consent to the search of his residence and the seizure

of evidence, including documents and items pertinent to the investigation.  Kilgore testified that he read the consent form before he signed it.

"[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."  *United States v. Watson*, 423 U.S. 411, 424 (1976).  "The fact that consent was given while [defendant was] under arrest does not, in and of itself, make it involuntary, especially where a defendant was informed of his right not to consent and informed of his Miranda rights."  *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990)(internal quotations and citations omitted).  Also, "[b]aseless threats to obtain a search warrant may render consent involuntary;" however, [w]hen the expressed intention to obtain a warrant is genuine . . . and not merely a pretext to induce submission, it does not vitiate consent."  *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992); *see also Kaplan*, 895 F.2d at 622 ("Even if Agent Clayton made it improperly appear to the defendant that the obtaining of a search warrant was a *fait accompli*, this error was not fatal under the circumstances of this case since there was probable cause to obtain a warrant and it was apparent no coercion was exercised."); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983)("Agent Marano told Martinez-Torres that he could obtain a warrant.  This statement, clearly true in light of the ample evidence of illegal activity, does not vitiate the consent since advising a person of the fact that a search warrant can be obtained does not constitute coercion.")(internal citations omitted).  The court finds, under the specific facts

of this case, neither the fact that Kilgore was in custody nor the fact that Beams told him of his intent to obtain a search warrant vitiated Kilgore's consent.

Kilgore testified that he signed the consent-to-search form because of an implied threat to loose the drug dog on his cats. The court specifically finds that Kilgore's testimony regarding the threat of harm to his cats was not credible.

Based on the testimony the court finds that Kilgore freely and voluntarily consent to the search and seizure of "whatever document or items of property whatsoever [that the officers] deem[ed] pertinent to their investigation." The marijuana plants, the folder containing apparent child pornography, and the computer and discs, which could have contained documents relating to marijuana growth and distribution, were properly seized incident to consensual search. Therefore, defendant's Motion to Suppress as to this evidence is due to be denied.

Defendant's Motion to suppress his statements made after the discovery and seizure of this evidence is also due to be denied.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant's Motion to Suppress is due to be denied. An Order denying defendant's Motion to Suppress will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 15th day of August, 2005.

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE